Doris S. Zaidman *vs.* Samuel S. Cohen.

April 2, 1948.

Present: Flynn, C. J., Capotosto, Baker and Condon, JJ.

20

CONDON, J.   This is a bill in equity for the cancellation of a mortgage on certain real estate on. Larch street in Providence belonging to Jacob S. Cohen, late of the town of Foster, deceased, who devised said real estate to his daughter Doris S. Zaidman, the complainant herein.   The respondent, Samuel S. Cohen, is a brother of the deceased and the holder of an unrecorded transfer of that mortgage. Complainant claims that respondent was paid the full amount of the balance due on the mortgage on March 1, 1943 and that she is entitled to have the mortgage discharged on the record.   After a hearing on bill, answer and proof, the superior court entered its decree denying and dismissing the bill of complaint.   From that decree complainant has appealed to this court.

The appeal is based on two grounds, but on our view of the evidence it will be sufficient to consider only one, namely, that the decree is contrary to the evidence and the weight thereof.   Complainant contends that she proved her case in the superior court by a fair preponderance of the evidence and that the trial justice clearly erred in finding to the contrary.   We are of the opinion after considering the evidence and the reasonable inferences to be drawn therefrom that such contention is correct.

Jacob S. Cohen died on August 19, 1943 possessed of a substantial estate which he disposed of by will.   He left the Larch street real estate to the complainant and did not state or otherwise indicate in his will that it was encumbered by a mortgage.   On the contrary complainant testified that her father had told her on two occasions,

one in New York in March 1943 and the other in Boston, Massachusetts, on May 21, 1943, that the property was to be hers if anything happened to him and that it was free and clear. She also testified that the respondent said to her at the reading of her father's will a few days after his funeral that she was a lucky girl and that he had held a mortgage on the property but now it was clear. Respondent denied that he ever made such a statement. However, complainant's brother Herbert B. Cohen, who was present on that occasion, substantially corroborated her.

After her father's death the complainant took over the management of the property and collected the rents from the tenants. Respondent was a tenant and he paid his rent regularly to the complainant. He did not inform her or anyone else that he held a mortgage on the property until the spring of 1946 when he told a prospective purchaser. And it was not until after the final hearing of the instant cause in the superior court in November 1946 that he demanded any payment of interest or principal on the mortgage. A satisfactory reason for such concealment cannot, in our opinion, be found anywhere in the record. Respondent testified concerning the transfer and his financial relations with his brother but such testimony is, to say the least, open in some particulars to inferences unfavorable to the respondent.

The circumstances surrounding the transfer were most peculiar. Jacob S. Cohen originally mortgaged the real estate in question to the Peoples Savings Bank in Providence for $6000 and by March 1, 1933 had reduced the mortgage to $3450, when it was transferred to the respondent. According to the respondent's testimony, he did not go to the Peoples Savings Bank but gave his check for $3450 to his brother Jacob, who handed it to the bank and received the mortgage and note, together with other documents pertaining thereto, and also a transfer made out to Samuel S. Cohen. Respondent testified further that Jacob did not deliver those papers to him but kept the mortgage

and note which he placed in his personal safe in the office of the Washington Finance Company of which he and respondent were directors; and that Jacob placed the transfer, the title policy, and a letter addressed to his wife informing her of the mortgage transfer, in a long manila envelope with the name "Sam" typed on it, in which respondent kept his personal papers. That envelope was kept in another safe, in the front office of the finance company, to which respondent had access.

After Jacob's death respondent did not ask anyone in the finance company's office to give him the mortgage and note nor did he ever ask the complainant or Jacob's executor for those papers. And yet respondent claims that Jacob, at his death, owed him a balance of $2500 on the mortgage loan. He filed a claim against Jacob's estate for the sum of $274.56, which was for expenses that he had incurred at the time of Jacob's last illness and death in New York. That claim was paid without question, and he gave a receipt acknowledging that it was payment in full of his claim against the estate.

He did not file a claim for the balance due on the mortgage because, as he said, he knew enough about the law to know "that as far as real estate it has nothing to do with an estate." Yet a short time before that explanation was given he had testified that he said at the reading of the will: "I want you children to know that I have a legitimate claim, and I refuse to file the legitimate claim, of thirty-five hundred dollars." He further testified that he did not state the basis of the claim and that he said, "Let's forget it." What he was referring to was the mortgage.

Thus, if respondent is to be believed, at one time he explains that he did not file a claim for the unpaid balance of the mortgage because he knew it was not a claim which could be filed against the estate, and at another time he says he did not file such a claim because he generously decided to "forget it." Incidentally the balance is $2500 and not $3500, as he claimed. It is difficult to believe the

respondent in such circumstances. If he wished to forgive a mortgage debt which his brother Jacob owed him he knew that the only effective way to do it, assuming that he did not have the mortgage and note in his possession, was for him to record the mortgage transfer which he held and discharge the mortgage of record. He did neither.

On the witness stand respondent gave another explanation of his conduct in not asking for payment of the balance of the mortgage which is equally unconvincing. He said when the will was read he received an insurance policy in the amount of about $6000 which although originally payable to the complainant had been assigned to him, and that he decided in his own mind since he was receiving that sum he would not press for payment of the mortgage. If that was his intention why did he not then disclose to complainant his possession of the mortgage transfer? But a few days later he discovered there was a further assignment of the policy and that it was not payable to him after all. Instead of getting $6000 it developed that he received nothing.

Thus the reason which he gave for his silence now no longer existed. Thereafter the natural thing for him to have done would have been to apprise complainant of his ownership of the mortgage, if it was still unpaid. But he did nothing and neither asked for nor received a single payment of interest after Jacob's death. Indeed, he allowed almost three years to pass without telling the complainant of the mortgage transfer which he held. For one who was thus disappointed in not receiving a $6000 insurance policy and who had little or no affection for his niece, as he himself testified, that was strange conduct. That he acted in such a manner is more consistent with the fact that he did not have a legitimate claim for $2500.

There is another phase of the evidence which leaves respondent in anything but a favorable light. He was a university graduate in accountancy, a director of the Washington Finance Company, and a man versed in business

affairs. He testified that after he purchased the mortgage Jacob paid him the interest every six months and that he kept a record on penciled slips of paper. Respondent was served with a subpoena duces tecum with which he complied by presenting in court, among other things, a typewritten list of all interest payments on the mortgage and the dates thereof. When questioned concerning the list he admitted that he had typed it from his original pencil records and then destroyed those records, and volunteered the opinion that he thought the list was as good as the original records. He could not remember whether those payments were made in cash or by check. The trial justice who saw and heard him testify made the following comment on this unusual procedure: "Then we have the situation of a pretty clever business man, Samuel Cohen, a graduate of Boston University, a certified public accountant—or at least an accountant—who was handling these huge sums of money and hasn't any record—no record whatsoever. He brings up here a typewritten statement which is a summary of certain elements connected with the case and admits he took the papers on which the original notes were made and tore them up."

Complainant offered in evidence Jacob Cohen's check payable to respondent in the sum of $2500 dated March 1, 1943, the day when interest was due, and claimed that this check was the final payment on the mortgage. Respondent admitted receiving and cashing the check but contended that it was for another loan which he had made to Jacob. He had no record of such a loan but explained this by saying he had frequently loaned his brother "huge sums" of which he kept no record. He insisted that he could find tens of thousands of dollars in checks of Jacob in repayment of such loans. He testified in cross-examination: "If you will permit me I will go into your office and pick out hundreds or tens of thousands of dollars that he gave to me. There will be tens of thousands." When this challenge was accepted and complainant's counsel requested a continuance

to give respondent an opportunity to go through Jacob Cohen's papers respondent's counsel promptly objected and insisted on proceeding with the hearing which was then near its close.

Another peculiar thing about respondent's testimony as to what occurred after the mortgage was transferred was that Jacob gave to him the letter which Jacob wrote to his own wife explaining the transfer of the mortgage to the respondent. That letter was written in Yiddish and signed by Jacob in Yiddish and in English. It is in evidence as an exhibit accompanied by a translation which reads as follows:

"March 1, 1933.

Beloved Ida:—

My brother Sam today took over the mortgage on our house, from the Peoples Savings Bank, upon which I owe a balance of three thousand four hundred and fifty dollars. ($3,450.00).

I have asked him to do this for me, because it is now difficult for me to pay the Bank $150.00, every six months on the principal.

The reason he has not recorded the transfer is, that he does not want anybody to know about it, as every transfer that is recorded, is published in the newspaper.

I will pay him the interest the same as in the Bank, 6% a year, every six months in advance.

(Yiddish)   Jacob A. Cohen
(English)   Jacob S. Cohen

All the documents of the Mortgage he left with me in the safe, because he has confidence in me and you.

Jacob

Today, April 5, 1935, I gave Sam $950.00 on the principal of the Mortgage.

The balance now is $2500.00, twenty five hundred.

Jacob A. Cohen"

Respondent testified that it was written in Yiddish so that Jacob's wife, who could not read English, could read it. If this letter was for her information why should Jacob give it to the respondent rather than keep it with his own private papers where it could have been found at his death

26

and delivered to her? Why did respondent himself not give it to her at Jacob's death? He did not disclose the existence of that letter until the hearing in the superior court, mainly we suppose to show that Jacob made only one payment of $950 on the principal of the mortgage as that was the only payment noted in the letter. Was this letter always in the respondent's possession or did he, in some way, obtain it after Jacob's death? In answer to that question complainant points out the following significant sentence in the letter: "All the documents of the Mortgage he left with me in the safe, because he has confidence in me and you." This contradicts the respondent's testimony to the effect that he was given the transfer, the title policy and the letter, all of which are certainly documents pertaining to the mortgage. In our opinion respondent has not satisfactorily explained any of these peculiar circumstances surrounding his testimony about the transfer of this mortgage.

Did he have the duty of making such an explanation? We think he did. After complainant had offered evidence of respondent's statement to her shortly after Jacob's death that the real estate was clear and of two statements of Jacob, shortly before his death, to the same effect, as well as proving a payment to the respondent of $2500 as the balance of the mortgage, on the day when interest was due, respondent had the burden, especially after admitting the receipt of such sum, of going forward with evidence which would show that such payment was not a payment on the principal of the mortgage. In his attempt to discharge that burden he has presented evidence of little or no probative value. On the contrary, most of it was of such a character as to raise inferences unfavorable to him as we have pointed out above.

We think that the trial justice did not take all of the above factors into consideration when he decided that complainant had not proved her case by a preponderance of the evidence. While he practically discredited the respondent by the observation of him which we have hereinbefore

quoted he made no such express statement as to the complainant. All that he said as to her was that both sides had opportunities for perjury. That is not a finding that her testimony was discredited. *Opportunity* for perjury, which perhaps in every case is always present to a greater or less degree, is not enough to discredit a witness. We are of the opinion that the trial justice's observation is not fairly applicable to the complainant. On the record she appears to be a straightforward witness and gives no indication, by her answers in either her direct or cross-examination, of evasiveness, exaggeration or prevarication. And the trial justice does not make any comment adverse to her as far as her demeanor on the witness stand is concerned. The same may be said of Herbert B. Cohen, her corroborating witness. On the whole, therefore, we think that the trial justice's decision was clearly wrong, and that complainant should have relief to the extent of the discharge of the mortgage on the record by the respondent.

The complainant's appeal is sustained, the decree appealed from is reversed, and the cause is remanded to the superior court for the entry of a decree in accordance with this opinion.

*Judah C. Semonoff, Harry Goldstein* and *Ralph Semonoff,* for complainant.

*Aram A. Arabian,* for respondent.